IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| MARIA NAIA | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| NANCY A. BERRYHILL, | : | |
| Acting Commissioner for | : | |
| Social Security | : | NO. 17-8072 |

O P I N I O N

JACOB P. HART					DATE:  January 16, 2019
UNITED STATES MAGISTRATE JUDGE

Maria Naia brought this action under 42 USC §405(g) to obtain review of the decision of the Commissioner of Social Security denying her claim for Disability Insurance Benefits ("DIB").  She has filed a Request for Review to which the Commissioner has responded.  As set forth below, I will deny Naia's Request for Review, and affirm the decision of the ALJ.

I.	Factual and Procedural Background

Naia was born on September 18, 1956.  Record at 181.  She completed the fourth grade. Record at 200.  In the past, she worked for twenty years as a sewing machine operator.  Id.  On April 24, 2014, Naia filed an application for DIB.  Record at 181.  In it, she alleged disability since October 31, 2013, as a result of vertigo, asthma, depression, memory loss, and back pain. Record at 181, 199.

Naia's application for benefits was denied initially and upon reconsideration.  Record at 85, 99.  She then requested a hearing *de novo* before an Administrative Law Judge ("ALJ"). Record at 112.  A hearing was held on July 12, 2016.  Record at 32.  On August 30, 2016, however, the ALJ issued a written decision denying benefits.  Record at 17.

The Appeals Council denied Naia's request for review, permitting the ALJ's decision to stand as the final decision of the Commissioner. Record at 1. Naia then filed this action.

II.     Legal Standards

The role of this court on judicial review is to determine whether the Commissioner's decision is supported by substantial evidence. 42 U.S.C. §405(g); Richardson v. Perales, 402 U.S. 389 (1971); Doak v. Heckler, 790 F.2d 26, 28 (3d Cir. 1986); Newhouse v. Heckler, 753 F.2d 283, 285 (3d Cir. 1985). Substantial evidence is relevant evidence viewed objectively as adequate to support a decision. Richardson v. Perales, supra, at 401; Kangas v. Bowen, 823 F.2d 775 (3d Cir. 1987); Dobrowolsky v. Califano, 606 F.2d 403 (3d Cir. 1979). Moreover, apart from the substantial evidence inquiry, a reviewing court must also ensure that the ALJ applied the proper legal standards. Coria v. Heckler, 750 F.2d 245 (3d Cir. 1984).

To prove disability, a claimant must demonstrate that there is some "medically determinable basis for an impairment that prevents him from engaging in any 'substantial gainful activity' for a statutory twelve-month period." 42 U.S.C. §423(d)(1). As explained in the following agency regulation, each case is evaluated by the Commissioner according to a five-step process:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled. (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement in §404.1590, or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled. (iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled. (iv). At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled. (v). At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not

disabled.  If you cannot make an adjustment to other work, we will find that you are disabled.

20 CFR §404.1520 (references to other regulations omitted).

III.     The ALJ's Decision and Naia's Request for Review

In her decision, the ALJ found that Naia suffered from the severe impairments of asthma, headaches, and an adjustment disorder with a depressed mood.  Record at 19.  She found that no impairment and no combination of impairments met or medically equaled a listed impairment.  Record at 20.

According to the ALJ, Naia retained the residual functional capacity ("RFC") to engage in work at any exertionary level, with the following limitations:

> She is precluded from working around hazards related to falling (heights, dangerous machinery, and dangerous equipment).  She is precluded from climbing ladders, ropes, and scaffolds, and balancing, crouching, and crawling.  She is limited to occasional climbing of ramps and stairs and stooping and kneeling.  She should avoid concentrated exposure to extreme cold and fumes, odors, dusts, smoke, gases, and poor ventilation.  She should avoid concentrated exposure to loud noise.  She is able to perform simple and repetitive tasks.

Record at 21.

Relying upon the testimony of the vocational expert who appeared at the hearing, the ALJ concluded that Naia could work as counter supply worker, hand packager, or a dining room attendant, all at the medium exertionary level.  Record at 27.  She decided, therefore, that Naia was not disabled.  Id.

In her Request for Review, Naia argues that the ALJ erred in finding that she could work at the heavy exertionary level.  She also argues that her hearing was not conducted consistently with her due process rights.  In the Statement of Issues in her memorandum, Naia also set forth as an issue: "Did the AL properly consider the impairment of arachnoid cyst?" Although this issue was not discussed until Naia's reply memorandum, it too will be considered.

IV.    <u>Argument</u>

A.    <u>Naia's Ability to Engage in Work at the Heavy Level</u>

Naia has captioned "Point I" of her argument: "The ALJ Erred at Step 5 of the Sequential Evaluation." However, in this section of her Memorandum, she argues that the ALJ erred in finding that she could engage in heavy work, and in failing to accept the assessment of Marc Weber, MD, the consulting examiner who limited her to sedentary work. These do not implicate the fifth step of the sequential examination, but rather the assessment of the RFC, which takes place between steps three and four.

In any event, as stated above, the ALJ found that Naia could work at any exertionary level. This was a reflection of her conclusion that Naia did not suffer from an impairment which would limit her physical exertion. In her questioning of the vocational expert, however, the ALJ recognized that Naia would be limited to work at the medium exertionary level because of her age. Record at 64. As noted, the jobs which the ALJ testified that Naia could perform were all at the medium level. Record at 27. Any error by the ALJ in implying that Naia could work at the "heavy" level was, therefore, harmless.

Naia, however, points to the RFC assessment form completed on October 23, 2015, by Dr. Weber. Dr. Weber found that Naia could occasionally lift up to ten pounds, but that she could never lift more weight, and could never carry any weight. Record at 411. In support of this finding, he wrote: "Easily disoriented and confused. Loss of balance." <u>Id</u>. For the same reasons, Dr. Weber found that Naia could sit for six hours in an eight-hour workday, but could only stand or walk for one hour each. Record at 412. This would limit her to sedentary work.

The ALJ wrote that she gave little weight to this assessment, because the limitations Dr. Weber found were not supported by the medical evidence of record, and were based largely on the subjective reports of Naia and her daughter, who accompanied her to the examination. Record at 25. The ALJ also noted that the RFC assessment was not consistent with the part of Dr. Weber's report which described an essentially normal physical examination – to which she gave "considerable weight." Id.

Dr. Weber wrote that Naia had normal muscle strength in all extremities, and normal grip and pinch strength in her hands. Record at 409. Her muscle tone was within normal limits. Id. Her reflexes were normal, although her vibration sense was impaired in the feet. Id. Despite decreased sensation to light touch and pinprick, Naia's hands were fully functional. Id. She ambulated independently with no assistive device. Record at 408.

In fact, Dr. Weber specifically attributed Naia's RFC limitations to problems with balance, confusion, and disorientation, and not to any physical infirmity or postural limitation. Record at 411-412. The ALJ accommodated Naia's balance issue in her RFC assessment by restricting her to work where she would not be around falling hazards and would not need to climb. The limitation to simple, repetitive tasks addressed her cognitive issues. Record at 21.

It can also be noted that physical examinations by Viren Desai, MD, Naia's general practitioner, were normal. A March 5, 2014, progress note revealed a normal gait, 5/5 muscle strength, intact sensation and normal reflexes. Record at 277. The same findings were present on March 12, 2014. Record at 267. On both of these visits, and on November 13, 2013, and July 16, 2014, Dr. Desai noted that Naia had no musculoskeletal abnormalities. Record at 267, 277, 349, 393. The ALJ's rejection of Dr. Weber's RFC limitations was, therefore, supported by substantial evidence.

B.     The Arachnoid Cyst

A March 27, 2014, MRI of Naia's brain showed the presence of an arachnoid cyst. Record at 329. In her reply brief, Naia argues that the ALJ ignored the significance of this finding. However, even the material which Naia has attached to show that an arachnoid cyst in the brain can cause headaches, behavioral changes, and decreased cognitive performance, also states: "Some arachnoid cysts cause no symptoms at all." Thus, more than the mere presence of an arachnoid cyst is necessary to prove impairment.

In this case, Naia's treating neuropsychiatrist, Frederick Weisbrot, MD, PA, wrote on April 16, 2014: "As for her MRI findings, I do not believe they are the basis for her headaches. The arachnoid cyst is probably clinically not significant." Record at 329. He recommended monitoring to make sure the cyst did not enlarge. Id. An October 24, 2014, repeat MRI showed that the cyst had not grown. Record at 407.

There was no medical opinion in the record contradicting Dr. Weisbrot's opinion regarding the arachnoid cyst. In a June 16, 2014, report, neuropsychiatrist Peter Crain, MD, attributed Naia's headaches to a migraine syndrome. Record at 331. Kim Arrington, Psy.D., a consulting mental health expert, suggested on July 30, 2014, that "neurocognitive disorder due to cyst on brain" be ruled out. However, Dr. Weisbrot had already ruled it out in his April 6, 2014, report.

It is true that Dr. Arrington observed impaired concentration and memory in Naia's mental status examination. Record at 404. So did Dr. Weber. Record at 408-9. Dr. Weber also wrote: "At the end of the examination … she appeared to have a flat affect and did not seem to be focused and actually did have the appearance of being disoriented. As per her daughter who accompanied her on the examination, this is typical after the claimant is asked to do a number of

tasks." Record at 409.  This is consistent with Naia's daughter's testimony at the hearing that her mother was frequently confused or disoriented.  Record at 59-61.  Thus, the record was not devoid of anecdotal evidence suggestive of a brain disorder.

Nevertheless, the record contains no diagnosis of brain damage, dementia, or any other brain impairment.  In the absence of such medical evidence – and particularly considering Dr. Weisbrot's expert opinion that the cyst was insignificant – the ALJ would not have been entitled to make her own inference that Naia suffered from cognitive impairments because of her arachnoid cyst.  An ALJ is not entitled to substitute her lay opinion for the medical opinion of an expert.  Morales v. Apfel, 225 F.3d 310, 319 (3d Cir. 2000); Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999).  For that reason, there is no merit to Naia's argument that the ALJ erred regarding the evidence of an arachnoid cyst.

C.   Due Process

Naia argues that the ALJ "rushed the process and was impatient in handling" her case.  She points out the ALJ urged her counsel to complete his questioning several times.  She also maintains that the ALJ prejudged her case, as evidenced by her remark to counsel that she did not accept Dr. Weber's report.

Deprivation of the right to due process will not necessarily be found in a Social Security hearing even when an ALJ is "rather brusque", as long as there is no indication that the ALJ has a conflict of interest or inability to render a fair judgment.  See Fraser v. Astrue, 373 Fed. Appx. 222, 225 (3d Cir. 2010), and Taylor v. Commissioner of Social Security, Civil No.: 16-5033 (2018 WL 2298359) at *8, n. 5 (citing Fraser); Siravo v. Commissioner of Social Security, Civil No. 15-2836, 2017 WL 1246347 at *7 (citing Fraser, no bias found although ALJ may have been "terse or frustrated" with the Plaintiff).

The transcript in this case does not include notations as to the time it commenced and/or the time it ended. However, it took up 38 pages of the record, which is a fairly average length for a hearing. Record at 34-72. Naia testified through a translator, since she did not speak fluent English, and some delay was caused by ensuring the translation process was accurate. Record at 38-39, 46, 49-50.

The ALJ did urge counsel several times to complete his questioning of Naia. Counsel pushed back against the ALJ's suggestion. Specifically, after counsel questioned Naia for three pages, establishing in some detail the requirements of her past job, and that she experienced forgetfulness, confusion, and dizziness when she bent her head forward, the ALJ stated: "Can you wrap it up, counsel?" Record at 53-56. Counsel nevertheless continued to elicit from Naia the fact that she could not engage in crochet, because bending her head forward caused dizziness, and no longer gardened, for the same reason. Record at 57.

The ALJ then stated: "Counsel, we are going to move on now to the vocational expert." Record at 57. Counsel objected that he had not completed his questioning. Record at 57. The ALJ said: "So, you've asked for many examples of things she does in her daily activities, and I don't want to hear anymore the things she does in her daily activities." Id. Nevertheless, counsel objected again that he had not finished his questioning. This interchange followed:

ALJ: We are going to move on, because we need to move on, it is a full day for us.

COUNSEL: This is –

ALJ: One more question.

COUNSEL: This is an important thing for the claimant, and I have a witness also, your honor.

ALJ: The witness will have to be very quick.

8

>COUNSEL:  Your honor, this is very important to this woman, this whole proceeding is extremely important.
>
>ALJ:  It's important to the other people who have hearings today as well.
>
>COUNSEL:  I don't quarrel with that but – this individual [is] speaking right now.

Record at 58.

Ultimately, counsel asked Naia several more questions about her daily activities, and then presented as a witness Naia's daughter, who testified for two and a half pages without interruption from the ALJ.  Record at 58-61.

Counsel later interrupted the ALJ when she was questioning the vocational expert, which led to another contentious exchange:

>ALJ (to the vocational expert):  Are there other jobs in the national economy for such a person?
>
>COUNSEL:  Your honor, we would submit that the grid would directly find – disabled for this lady at her age and with her language limitations and educational limitations.
>
>ALJ:  This is 204.0, counsel?
>
>COUNSEL:  You are – hypothesized a functional capacity to do light work.
>
>ALJ:  You may hypothesize that, I hypothesize a functional capacity that does not restrict her to light work, but in fact restricts her from these various things that – being dizzy would stop her from doing.  But I found nothing – no objective evidence on the record that would restrict her to light work.
>
>COUNSEL:  Your honor, look at the functional assessment from the [INAUDIBLE] consultative examiner.
>
>ALJ:  Which is not an objective test.  There is [*sic*] no x-rays, there is nothing.  There is no –
>
>COUNSEL:  There's MRIs.
>
>ALJ:  Nothing that would restrict her to light work.
>
>COUNSEL:  There's MRIs of the brain.

>ALJ:  The MRI of the brain is the reason she gets apparently identified as a physical reason for her dizziness.  These are – these restrictions cover all forms of dizziness.  OK?
>
>COUNSEL:  Dizziness impacts upon the functions of walking, standing, bending, lifting.
>
>ALJ:  I am not gong to argue with you about it any more.  [To the vocational expert].  Are there other jobs in the national economy that such a person could perform?

Record at 64.

Later, counsel asked the vocational expert:  "Can you explain how confusion and disorientation impacts on the ability to engage in work activities?"  Record at 66.  The ALJ then stated:  "You have to put it into residual functional capacity type of question, counsel."  Record at 66.  Again, counsel was inclined to dispute the point, responding:  "Your honor is free to absolutely ask the questions that your honor feels – I'm asking the questions that I feel are appropriate, is that OK?"  Id.

The ALJ explained that this was not OK:  "You cannot burden – you cannot burden the vocational expert with interpreting what you mean, if you have a restriction that is in some kind of mental or physical residual functional capacity, ask her that.  She cannot interpret what you mean about confusion."  Id.  Counsel retorted:  "I think she can speak for herself, you honor" and attempted to proceed asking his question.  Id.  The ALJ then interrupted counsel:  "I can speak for her on that score.  It's not her job and I will not allow you to ask her questions that she has to try to interpret, you have to ask the question right."  Record at 67.

Nevertheless, counsel persisted in asking questions without quantified limitations, such as "If an individual has difficulty concentrating, does that negatively impact upon the ability to do the three jobs you have cited?" and "If the worker has difficulty – significant difficulty maintaining a regular schedule, would that negatively impact on the ability to do the three jobs you have cited?" Record at 68, 69.

The ALJ repeatedly instructed counsel to employ quantified limitations, but counsel disputed the validity of her instructions:

> ALJ:  It's too big, I cannot ask it that way, neither can you.  The person is unable to – or can only do that for one third of the time.  If she's only able to maintain a regular schedule for one third of the time, that's a proper question.  "Difficulty" is not a proper question.
>
> COUNSEL:  Your honor, this isn't a game.
>
> ALJ:  This is the regulation. … This is how you have to ask the questions of the vocational expert.
>
> COUNSEL:  What regulation are you citing? … I would submit there is no such regulation.

Record at 69-70.

It was at this point that the ALJ made the comment that Naia claims showed that she had prejudged the case:

> COUNSEL:  My understanding of the law is that the tribunal must defer to the experts in medicine in terms of functionality, and Dr. Weber is the expert who has made a residual functional capacity assessment which precludes the work she has done in the past, and with her vocational background precludes any of the work which exists in significant numbers, that's the record, your honor.
>
> ALJ:  That is a one-time examination, as you know I'm not required to accept the conclusions on that examination, I will explain why in the decision.  You are not – I'm not going to keep arguing with you.  If you have something to ask the vocational expert, then you can put it in terms that are acceptable –
>
> COUNSEL:  I would trust that your honor has had –
>
> ALJ:  I am closing the hearing, counsel, I'm not going to sit here badgering with you.
>
> COUNSEL:  I would trust that your honor has not prejudged the case, when your honor says, you are not going to give credence to the findings of the expert physician who examined on behalf of the agency.
>
> ALJ:  That's not prejudging the case, counsel.  That's looking at all the evidence.  I asked you many times whether there's anything on the record to support various allegations, there isn't.

Record at 70-71.

When the ALJ's comments are seen in context, it is not even clear that she was unduly brusque. The contentious tone of the hearing was caused at least as much by counsel's unusually – and arguably uninformed – confrontational style, as it was by anything the ALJ said or did.[1] And, as above, an ALJ who is "rather brusque" does not violate due process. See Fraser v. Astrue, supra. There is no indication that the ALJ's interactions with counsel caused a conflict of interest, or prevented her from rendering a fair judgment.

Further, although the ALJ did comment at the hearing on her view of the medical evidence, Naia's testimony was considered in her decision. Record at 22. The fact that the ALJ incorporated limitations relating to dizziness in her RFC assessment shows that she did not entirely disregard this testimony. The undisputed neuropsychiatric evidence that Naia's head MRI was essentially normal, and the arachnoid cyst unconnected to her dizziness, would have made it difficult for the ALJ to have issued a well-supported decision crediting all of Naia's allegations as to the extent of her limitations.

As the Commissioner has emphasized, Naia obtained a hearing in which she was questioned at length by both the ALJ and her own counsel. Her daughter was able to testify. Both the ALJ and counsel questioned the vocational expert. Evidence obtained at the hearing was included in the ALJ's decision. As such, Naia has not demonstrated a deprivation of her due process rights.

---

[1] Counsel stated in closing: "This woman has positive findings on an MRI of the brain, she's complained to the doctors of headaches, dizziness, disorientation, memory loss. The positive findings in the MRI of the brain are the objective evidence which supports her complaints. There is no reason whatsoever to reject her complaints. Why hold the hearing if you're just going to ignore what the claimant has to say, it's inappropriate, what she said is consistent with the medical record and precludes all work activity. Now those Social Security taxes are very high taxes, there are regressive tax and they are for insured – insurer's benefit for someone once they become unable to work. Uncle Sam has taken her premium for those taxes, now is the obligation of Uncle Sam to pay her the benefits for which she paid the premiums." Record at 71.

V.       Conclusion

In accordance with the above discussion, I conclude that the decision of the ALJ must be affirmed, and judgment entered in favor of the Commissioner.

BY THE COURT:

/s/ Jacob P. Hart
_____
JACOB P. HART
UNITED STATES MAGISTRATE JUDGE